# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 37226

| | |
|---|---|
| JANET BELL NIGHTENGALE, | ) |
| | ) **Boise, June 2011 Term** |
| Plaintiff-Appellant, | ) |
| | ) **2011 Opinion No. 83** |
| v. | ) |
| | ) **Filed: July 11, 2011** |
| KEVIN MATTHEW TIMMEL, M.D., | ) |
| | ) **Stephen W. Kenyon, Clerk** |
| Defendant-Respondent. | ) |
| _____ | ) |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Michael R. McLaughlin, District Judge.

The verdict is <u>affirmed</u>. The award of discretionary costs for expert witness fees is <u>vacated</u>. No attorney fees or costs are awarded on appeal.

Dinius & Associates, PLLC, Nampa, for appellant. Michael J. Hanby argued.

Powers Tolman, PLLC, Twin Falls, for respondent. Jennifer Brizee argued.

_____

W. JONES, Justice

## I. NATURE OF THE CASE

Janet Bell Nightengale brought a medical malpractice action against Dr. Kevin Timmel, an emergency room doctor who treated her in July 2007. Dr. Timmel failed to diagnose a clot in one of Nightengale's vascular arteries. That condition cut off circulation to Nightengale's left arm, eventually requiring its amputation above the elbow. At trial, the jury returned a special verdict finding that Dr. Timmel had not breached the relevant standard of care in his treatment of Nightengale.

Nightengale appeals that verdict, arguing the trial court erred in: (1) determining that two letters sent by the doctor who performed the amputation on Nightengale were not admissible for any purpose under Idaho's peer-review statutes; (2) admitting testimony regarding Nightengale's

1

drug and alcohol use in 2009; (3) admitting expert testimony regarding Nightengale's decreased life expectancy due to her homelessness; (4) including Nightengale on the special verdict form; (5) requiring expert testimony in order to instruct the jury on recklessness; and (6) failing to strike a prospective juror for cause. She also challenges the district court's award of expert witness fees to Dr. Timmel as discretionary "exceptional" costs. We affirm the jury's verdict, but vacate the district court's award of discretionary expert witness fees.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This is a medical-malpractice action brought by Janet Bell Nightengale. In 2007, Nightengale was a homeless woman living in Boise, Idaho. She had a history of drug use and suffered from Hepatitis B and C.

On June 1, 2007, Nightengale was admitted to the Emergency Room at St. Luke's Regional Medical Center in Boise, Idaho (St. Luke's) with left-arm pain. Nightengale refused medical treatment and was discharged pursuant to the signing of a release acknowledging that she was leaving against medical advice.

On June 18, 2007, Nightengale returned to the St. Luke's Emergency Room with left-arm pain and neck pain. Dr. Jack Trainer performed some diagnostic tests, and discharged Nightengale with a diagnosis of radiculopathy (a compressed nerve in the spine), neck pain, alcohol withdrawal, and cervical degenerative disk disease. He treated her with ice packs and other anti-inflammatory and pain medication.

Nightengale was admitted to the Emergency Room at St. Alphonsus Regional Medical Center in Boise (St. Al's) on July 11, 2007, again complaining of left-arm and left-shoulder pain. She was seen by Dr. Jason Quinn. Nightengale was discharged with a diagnosis of "left arm pain" and treated with pain medication. She was also referred to the Terry Reilly Clinic in Boise to obtain a primary physician.

Five days later, on July 16, 2007, Nightengale went to the St. Luke's Emergency Room where she was seen by Dr. Kevin Timmel, the Respondent, for her left-arm pain. Nightengale told Dr. Timmel that she had been assaulted about two months earlier and had been experiencing the pain since then. Dr. Timmel performed a visual exam of Nightengale's arm but Nightengale pulled back when he attempted to perform a physical exam. Eventually Nightengale allowed Dr. Timmel to physically examine her shoulder, where the pain was not as intense, but the exam was

2

not completed because as Dr. Timmel moved down toward the elbow Nightengale began to cry and pull away.

Dr. Timmel administered morphine to Nightengale, ordered and reviewed x-rays, and determined that a bone injury was not likely. Dr. Timmel concluded that the most likely cause of the lump of soft tissue on Nightengale's left arm was a muscle tear. Dr. Timmel did not order any vascular studies, but stated that he considered vascular issues as a potential cause of her pain. He determined that given the information he had gathered, a vascular cause was exceedingly unlikely. Before Nightengale was discharged, Dr. Timmel ordered a sling for her and instructed her to follow up with an orthopedic specialist, Dr. Shea, the same week, which she did not do. He also told her to come back to the emergency room immediately if her condition got any worse, which she also admittedly did not do.

Four days after that visit, Nightengale went to her already scheduled appointment at the Terry Reilly Clinic in Boise. The nurse practitioner and doctor there told her to go immediately to the St. Luke's Emergency Room. At St. Luke's, Nightengale was seen by Dr. Dominic Gross, who performed a physical examination of her arm and told her he would have to amputate it. Nightengale was diagnosed with a clot of the subclavian artery which had caused her to have no blood circulation to her left arm or hand. The above-elbow left-arm amputation was performed that day by Dr. Gross at St. Al's.

Nightengale filed a complaint against Dr. Timmel and Dr. Jason Quinn, as well as Idaho Emergency Physicians, P.A., an association which provides physician staffing of hospital emergency departments in Boise; and both St. Luke's and St. Al's in their corporate capacities. She alleged that Dr. Timmel and Dr. Quinn engaged in medical malpractice in their treatment of her. In her Amended Complaint Nightengale removed St. Luke's and St. Al's from the case caption and added Emergency Medicine of Idaho, P.A., as a defendant. Prior to trial, the parties stipulated to the dismissal of Dr. Quinn, Idaho Emergency Physicians, P.A., and Emergency Medicine of Idaho, P.A.

The case went to trial with Dr. Timmel as the sole defendant. The jury found on a special verdict form that Dr. Timmel did not breach the standard of care in his treatment of Nightengale. The court entered judgment to this effect and awarded Dr. Timmel $12,750.56 as costs as a matter of right and $20,973.45 as discretionary costs, plus interest. Nightengale timely appealed from that judgment.

3

1.  Whether the district court erred in determining that two letters sent by the doctor who performed the amputation on Nightengale were privileged and thus not admissible for any purpose under Idaho's peer review statutes, and whether that error was harmless.

2.  Whether the district court erred in failing to strike a prospective juror for cause, and whether there was prejudice to Nightengale.

3.  Whether the district court abused its discretion in awarding expert witness fees to Dr. Timmel as discretionary costs that were "exceptional."

4.  Whether the district court erred in admitting testimony regarding Nightengale's drug and alcohol use in 2009 and whether that error was harmless.

5.  Whether the district court abused its discretion in admitting expert testimony regarding Nightengale's decreased life expectancy due to her extensive periods of homelessness, and whether that error was harmless.

6.  Whether the district court abused its discretion in including Nightengale on the special verdict form as a source of comparative negligence, and whether that error was harmless.

7.  Whether the district court abused its discretion in requiring expert testimony in order to instruct the jury on recklessness, and whether that error was harmless.

8.  Whether either party is entitled to attorney fees on appeal.

## IV. Analysis

### A. The District Court Did Not Err in Its Determination That the Peer-Review Statutes Applied to Dr. Gross' Letters

Dr. Dominic Gross is the orthopedic surgeon who examined Nightengale on July 20, 2007, and performed the above-elbow amputation of her left arm that same day. Dr. Gross was not a party to this litigation. After the surgery, Dr. Gross sent two letters dated October 2, 2007: one to Dr. Frederick Foss, the Trauma Medical Director at St. Al's (the Foss letter), and one jointly addressed to Dr. Richard Moore and Dr. Troy Watkins, the Chairman of Orthopedics at St. Al's and the Chairman of Orthopedics at St. Luke's, respectively (the Moore/Watkins letter). The letters were apparently inadvertently sent to Nightengale by Dr. Gross as part of the production of Nightengale's medical records. However, subsequently Dr. Gross recognized the error, and during Nightengale's deposition of Dr. Gross, Dr. Gross refused to answer any questions about the letters on the basis that they were privileged. Nightengale then filed a motion to compel, requesting that the court enter an order establishing that the peer-review privilege did not apply to the letters and compelling Dr. Gross to answer questions regarding the letters. The district court denied the motion, holding that the letters were privileged under I.C. § 39-1392 to -1392f because "Dr. Gross' purpose in writing the letters was to express his belief

that a review and examination of the Plaintiff's medical case would improve the care of patients in similar situations."

The trial court has broad discretion in determining whether or not to grant a motion to compel. *Kirk v. Ford Motor Co.*, 141 Idaho 697, 700, 116 P.3d 27, 30 (2005). The decision of the trial court "will only be reversed when there has been a clear abuse of discretion." *Id.* at 701, 116 P.3d at 31. However, to decide whether or not to grant the motion to compel, the district court was required to determine whether the medical peer review statute applied, rendering the documents privileged. "The burden of showing information is privileged, and therefore exempt from discovery, is on the party asserting the privilege." *Id.* at 704, 116 P.3d at 34. Further, this Court "freely reviews the interpretation of a statute and its application to the facts." *St. Luke's Reg'l Med. Ctr., Ltd. v. Bd. of Comm'rs*, 146 Idaho 753, 755, 203 P.3d 683, 685 (2009). Thus, we freely review the trial court's determination that the statute applied to the letters.

The purpose of the peer review statutes is "[t]o encourage research, discipline and medical study by certain health care organizations for the purposes of reducing morbidity and mortality, enforcing and improving the standards of medical practice in the state of Idaho." I.C. § 39-1392. To effectuate this goal, I.C. § 39-1392b creates a privilege for certain documents relating to these purposes. It states, in relevant part:

> [A]ll peer review records shall be confidential and privileged, and shall not be directly or indirectly subject to subpoena or discovery proceedings or be admitted as evidence, nor shall testimony relating thereto be admitted in evidence, or in any action of any kind in any court . . . for any purpose whatsoever.

I.C. § 39-1392b.[1] "[P]eer review records" are defined as "all evidence of interviews, reports, statements, minutes, memoranda, notes, investigative graphs and compilations and the contents thereof, and *all physical materials relating to peer review of any health care organization.*" *Id.* 39-1392a(12) (emphasis added). Thus, any document "relating to" peer review is absolutely privileged from both discovery and introduction as evidence for any purpose at trial. The plain language of the statute makes no requirement that the document have been created during an actual peer review, it simply requires that the document "relat[e] to" peer review of a health care

---

[1] There are several exceptions to this privilege laid out in I.C. § 39-1392c, however Nightengale does not argue that any of these exceptions apply; she merely argues that the privilege does not apply to the documents in the first place.

organization.[2]  Nightengale argues that "the document in question must be a product of 'any in-hospital medical staff committees or medical society.'" (quoting I.C. § 39-1392).  However, the clear language of the statute makes "*all* peer review records" privileged.  I.C. § 39-1392b.  A peer review record need only be physical materials "relating to" peer review.  *Id.* § 39-1392a(12).  If the Legislature only intended documents created as a product of an actual peer review to be covered by the statute, it would not have used the broad language "relating to."  "[P]eer review" in turn, is defined as:

> [T]he collection, interpretation and analysis of data by a health care organization for the purpose of bettering the system of delivery of health care or to improve the provision of health care or to otherwise reduce patient morbidity and mortality and improve the quality of patient care. Peer review activities by a health care organization include, without limitation:
>
> . . . .
>
>> (b) Quality assurance and improvement, patient safety investigations and analysis, patient adverse outcome reviews, and root-cause analysis and investigation activities by a health care organization; and
>>
>> (c) Professional review action, meaning an action or recommendation of a health care organization which is taken or made in the conduct of peer review, that is based on the competence or professional conduct of an individual physician or emergency medical services personnel where such conduct adversely affects or could adversely affect the health or welfare of a patient or the physician's privileges . . . .

*Id.* § 39-1392a(11).

Here, Dr. Gross' letters were properly characterized as privileged under the peer review statutes.  A review of both letters shows that Dr. Gross' clear intent in writing the letters was to point out potential flaws he suspected might have occurred in Nightengale's care, such as her being overlooked because she was homeless and Hepatitis B and C positive, and to request *review* and *investigation* of those flaws in the hospitals' respective care.  Indeed, the subject line of both of the letters stated "Re: Case Review, Janet Bell."  The Foss letter states "I would like this formally and informally reviewed.  I think a vascular surgeon should review the records."  The Moore/Watkins letter states: "Please review and examine this case. I think this is a valuable case that should be reviewed by everyone including Vascular Surgery, Orthopedics, Hand Surgery, and the Emergency Room Department."  Both letters relate to "[q]uality assurance and

---

[2] A "health care organization" is defined as "a hospital, in-hospital medical staff committee, medical society, managed care organization, or group medical practice."  I.C. § 39-1392a(3).  Both St. Luke's and St. Al's are hospitals under the statute.  *Id.* § 39-1392a(4).

6

improvement," "investigation activities," and "professional review" of Nightengale's treating doctors and hospitals. I.C. § 39-1392(a)(11).

Nightengale argues that the Foss letter concerns a "disagreement in billing procedures" and thus is not subject to the peer review privilege. However, a review of the letter reveals no mention of billing whatsoever. The only reference to a billing dispute was in the deposition of Dr. Gross, which does not affect whether the letter itself is privileged or not. Nightengale asked Dr. Gross whether he and Dr. Foss had disagreed about payment for the amputation of Nightengale's arm in their "correspondence," however, Dr. Timmel's counsel objected to questions about the correspondence on the basis of the peer-review privilege, and Dr. Gross refused to answer.

The district court did not err in finding that the privilege applied to Dr. Gross' letters that were clearly intended to initiate the peer review process. Further, it is in the public interest to protect and thereby encourage the writing of such letters that initiate the important process of peer review in order to provide better care to Idaho's citizens. The statute is intended to encourage doctors and health care organizations to speak freely about mistakes they have made in order to improve the health care system. Encouraging doctors to write letters, such as the ones Dr. Gross wrote to initiate the peer review process, is essential to "improving the standards of medical practice in the state of Idaho." *Id.* § 39-1392. Therefore, the district court correctly concluded that the letters were privileged under the statutes.

Subsequent to the denial of the motion to compel, Nightengale filed a motion in limine which included an argument that the Gross letters that the court had already held were privileged under the peer review statute should be admitted for impeachment purposes. The district court held in its memorandum decision on the motion in limine that it would not revisit the decision it made in the motion to compel. Because the letters were properly considered privileged by the peer review statutes, they were not admissible "for any purpose." *Id.* § 39-1392b. This necessarily would render the letters inadmissible for the purpose of impeachment.

Because we find no error, we do not evaluate whether any alleged error was harmless.

**B.** **The District Court Did Not Abuse Its Discretion in Failing to Strike Juror #1 For Cause**

Nightengale argues that the district court abused its discretion in not striking a juror for cause and that error was prejudicial. During voir dire, Juror #1 indicated that she thought people sued each other too much and she had a bias that plaintiffs were just trying to get money out of

7

defendants. Nightengale's attorney questioned Juror #1 further, and while she indicated that she had some anger at those who file lawsuits, she also stated that she could "determine between truth and non-truth" when "given the evidence." Nightengale moved to strike Juror #1 for cause, but the juror stated she could set bias and anger aside and make an impartial decision. The trial court then denied the challenge for cause.

"[A] trial court does not abuse its discretion by refusing to excuse for cause jurors whose answers during voir dire initially give rise to challenges for cause but who later assure the court that they will be able to remain fair and impartial." *Morris v. Thomson*, 130 Idaho 138, 141, 937 P.2d 1212, 1215 (1997). In *Morris*, the prospective juror indicated during voir dire that her relationship with the defendant could affect her ability to render a fair verdict. *Id.* at 142, 937 P.2d at 1216. Further questioning by defense counsel elicited the prospective juror's "assurance that she would put aside her relationship with [the defendant], endeavor to remain impartial, and follow the court's instructions." *Id.* Similarly here, the defense attorney questioned Juror #1 regarding her bias toward people that bring lawsuits. He asked her if she could "listen to all of the evidence and make a decision off of the evidence" and in doing so move her bias and anger "to the side" and "make a decision with eleven other individuals that are your peers." Juror #1 answered "Yes" to all of these questions. "[T]he court is entitled to rely on assurances from venire persons concerning partiality or bias." *State v. Hairston*, 133 Idaho 496, 506, 988 P.2d 1170, 1180 (1999). Therefore, because Juror #1 indicated she could make a decision based on the evidence, the court was entitled to rely on that assurance, and it did not abuse its discretion in denying the motion to strike her for cause.

Further, even if it did err in denying the motion to strike Juror #1 for cause, that error was not prejudicial. Juror #1 did not sit on the jury, and although the peremptory challenges were not exercised on the record, it is uncontested that Nightengale used a peremptory challenge to remove Juror #1. When a party uses one of its peremptory challenges to remove a juror it argues should have been removed for cause, the party must show on appeal that "he was prejudiced by being required to use a peremptory challenge to remove [the juror]." *State v. Ramos*, 119 Idaho 568, 570, 808 P.2d 1313, 1315 (1991). As in *Ramos*, here Nightengale "has not demonstrated, nor has [s]he even suggested, that any of the other remaining jurors on the panel were not impartial or were biased." *Id.* Therefore, any potential error here was harmless.

Nightengale argues that *Ramos* should be overturned. *Ramos* follows the general weight of authority on the issue, holding that an error in refusing to grant a challenge for cause "is grounds for reversal only if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him." 47 Am. Jur. 2d *Jury* § 205 (2006); *Ross v. Oklahoma*, 487 U.S. 81, 86, 108 S. Ct. 2273, 2277 (1988) (challenge to refusal of court to remove a juror for cause must focus on the jurors who ultimately sat on the jury); *People v. Hamilton*, 200 P.3d 898, 891 (Cal. 2009); *State v. Prtine*, 784 N.W.2d 303, 311–12 (Minn. 2010); *State v. Schmeiderer*, 319 S.W.3d 607, 632–33 (Tenn. 2010); *Cortez ex rel. Estate of Puentes v. HCCI-San Antonio, Inc.*, 159 S.W.3d 87, 90–91 (Tex. 2005). We decline to reverse *Ramos* and its requirement that the complaining party demonstrate that a member of the actual jury was impartial in order to show prejudice.

We find that there was no abuse of discretion in the trial court's reliance on Juror #1's assurances that she could be impartial and even so, the error was harmless because Nightengale cannot show any actual panel member was biased.

**C.     The District Court Abused Its Discretion in Awarding Expert Witness Fees as Discretionary Costs Because It Did Not Provide Sufficient Findings as to Why Those Costs Were "Exceptional"**

Nightengale argues that the costs awarded to Dr. Timmel by the trial court were unreasonable. Pursuant to I.R.C.P. 54(d)(1)(C), a prevailing party is entitled to certain costs as a matter of right. Under I.R.C.P. 54(d)(1)(D), a trial court may award discretionary costs to a prevailing party "upon a showing that said costs were necessary and exceptional costs reasonably incurred, and should in the interest of justice be assessed against the adverse party." "The district court's decision under I.R.C.P. 54(d)(1)(D) is reviewed under an abuse of discretion standard." *Total Success Invs., LLC v. Ada Cnty. Highway Dist.*, 148 Idaho 688, 694, 227 P.3d 942, 948 (Ct. App. 2010) (citing *Nampa & Meridian Irrigation Dist. v. Washington Fed. Sav.*, 135 Idaho 518, 525, 20 P.3d 702, 709 (2001)). Dr. Timmel was the prevailing party because the jury found he did not breach the standard of care.

The trial court found that Dr. Timmel was entitled to expert witness fees for three of his experts because their testimony was "necessary and exceptional." It noted that the "crux of the case" was Nightengale's contention that Dr. Timmel "did not diagnose an arterial blockage that ultimately caused the loss of a portion of [Nightengale]'s arm." It stated that this required Dr. Timmel to bring qualified physicians to testify regarding the relevant standard of care for this

9

specific issue and required "knowledgeable doctors who testified as to the vascular system within the body," and then awarded $10,730 in witness fees for Dr. Moorhead and $8,625 for Dr. Huang. It also awarded $829 for expert fees of Dr. Barros-Bailey because her "testimony was critical as to the issue of damages in this case." The court then denied several of Dr. Timmel's requested costs, finding that they were not exceptional.[3] "A court may evaluate whether costs are exceptional within the context of the nature of the case." *City of McCall v. Seubert*, 142 Idaho 580, 588–89, 130 P.3d 1118, 1126–27 (2006).

> In reviewing a grant or denial of discretionary costs, the key issue is whether the record indicates express findings by the district court as to whether a cost was necessary, reasonable, exceptional and should be awarded in the interests of justice. The district court does not have to engage in a lengthy discussion of these factors.

*Hayden Lake Fire Prot. Dist. v. Alcorn*, 141 Idaho 307, 314, 109 P.3d 161, 168 (2005).

In *Hayden Lake Fire Protection District*, the Court stated that "[c]ertain cases, such as personal injury . . . generally involve copy, travel and expert witness fees such that these costs are considered ordinary rather than 'exceptional.'" *Id.* Here, the only reason given by the district court to award expert witness fees as a discretionary cost is that the case required experts on the vascular system to travel and testify. Expert witness testimony is required in every malpractice case, I.C. § 6-1012, thus the district court seems to have concluded that the expert witness fees were exceptional simply due to the case being one for medical malpractice. Absent other findings, there is no basis for every expert witness' testimony to be considered "exceptional" simply because it requires specialized knowledge. *Fish v. Smith*, 131 Idaho 492, 493–94, 960 P.2d 175, 176–77 (1998) (not an abuse of discretion to find that the cost of hiring experts on accident reconstruction and medical diagnosis is routine and not exceptional in personal injury cases). That specialized knowledge and expert testimony is exactly the type of "ordinary" cost of both proving and defending a medical-malpractice claim. The fact that "[t]hese physicians were required to understand the local standard of health care practice and to have knowledge and understanding of causation as it related to damages" does not provide any basis as to why the costs are "exceptional" for a medical malpractice case. Because the district court did not provide sufficient findings under Rule 54(d)(1)(D) for why these costs are

---

[3] In her opening brief, Nightengale argues that the trial court's award of $2450 for in-house copying was excessive and unreasonable. However, the trial court specifically declined to award costs for this item. Thus the Court declines to address this argument.

10

exceptional we find that it abused its discretion. The award of $10,730 in expert witness fees for Dr. Moorhead, $8625 for Dr. Huang, and $829 for Dr. Barros-Bailey is vacated.

**D.     Since the Remaining Alleged Errors Only went to the Issue of Damages and the Jury Did Not Reach the Issue of Damages, They Are All Clearly Harmless**

The decision of the district court must be affirmed if the alleged error "did not affect a party's substantial rights or the error did not affect the result of the trial." *Myers v. Workmen's Auto Ins. Co.*, 140 Idaho 495, 504, 95 P.3d 977, 986 (2004). The remaining errors alleged by Nightengale: admitting testimony regarding Nightengale's drug and alcohol use, admitting expert testimony regarding Nightengale's decreased life expectancy due to her extensive periods of homelessness, including Nightengale on the special verdict form as possibly contributing to her injuries for failing to follow Dr. Timmel's discharge instructions, and requiring expert testimony in order to instruct the jury on recklessness, go to the issues of comparative negligence and damages that the jury never reached and therefore even if such rulings were error, such errors are harmless.

**E.     No Attorney Fees Are Awarded on Appeal**

Nightengale requests attorney fees on appeal under I.C. § 12-120 and -121, but provides no argument in support of that request. We will not consider a request for attorney fees on appeal that is not supported by argument. *VFP VC v. Dakota Co.*, 141 Idaho 326, 337, 109 P.3d 714, 725 (2005).

Dr. Timmel requests attorney fees on appeal under I.C. § 12-121, arguing that Nightengale's pursuit of this appeal was "frivolous, unreasonable and without foundation" because it was brought "despite clear and unambiguous law." Because we vacate the award of discretionary costs for expert witness fees, Nightengale's appeal was not without basis. *Farmers Ins. Exch. v. Tucker*, 142 Idaho 191, 196, 125 P.3d 1067, 1072 (2005). Thus the Court declines to award attorney fees to Dr. Timmel.

## V. CONCLUSION

The verdict in favor of Dr. Timmel is affirmed. The district court properly concluded that the peer-review statutes rendered Dr. Gross' letters privileged because those letters were "relating to" peer review. There was no prejudicial error in the failure of the court to remove Juror #1 for cause because there were no allegations of actual bias of the impaneled jury. The award of discretionary costs for expert witness fees is vacated because the court abused its discretion by not providing sufficient findings as to why the fees were "exceptional" in this case.

11

Nightengale's assigned errors that go to the issues of comparative negligence and damages are harmless because the jury returned a special verdict finding that Dr. Timmel did not breach the standard of care and thus never reached those issues. No attorney fees or costs are awarded on appeal.

Chief Justice EISMANN, Justices BURDICK, J. JONES and HORTON **CONCUR.**