## IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 42158

|  |  |  |
|---|---|---|
| ALESA TEREN EASTERLING, an individual, through her parents, ALLEN EASTERLING and TERESA EASTERLING, | ) ) ) ) | Boise, November 2015 Term |
| Plaintiff-Appellant, | ) ) | 2016 Opinion No. 6 |
| v. | ) ) | Filed: January 25, 2016 |
| ERIC PAUL KENDALL, M.D., | ) ) | Stephen W. Kenyon, Clerk |
| Defendant-Appellant. | ) ) |  |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Cheri C. Copsey, District Judge.

The judgment of the district court is affirmed in part and vacated in part.

Racine, Olson, Nye, Budge & Bailey, Chartered, Pocatello, for appellant. Richard A. Hearn argued.

Powers Tolman Farley, PLLC, Twin Falls, for respondent. Nicole L. Cannon argued.

---

J. JONES, Chief Justice

Appellant, Alesa Easterling, brought this medical malpractice suit against Respondent, Eric Kendall, M.D., alleging that Kendall was negligent in failing to diagnose her with a carotid artery dissection, and that such misdiagnosis delayed her treatment and resulted in her suffering permanent neurological damage. At trial, the district court granted Kendall's motion for a directed verdict. The district court concluded that Easterling failed to prove a medical malpractice claim because she failed to present expert testimony to show that Kendall's misdiagnosis was the proximate cause of her injuries. Easterling appeals, contending that expert testimony is not required under Idaho law to prove proximate cause in a medical malpractice action. Additionally, Easterling appeals the district court's orders excluding opinion testimony from Easterling's retained expert and treating physicians on the issue of causation and denying

1

her motion to present rebuttal opinion testimony on causation in her case in chief. Easterling also appeals the district court's award of discretionary costs to Kendall. Kendall requests attorney fees on appeal.

**I.**
**FACTUAL AND PROCEDURAL BACKGROUND**

On September 5, 2011, Alesa Easterling, then fifteen years old, was swimming at the YMCA in Twin Falls, Idaho, when she fell from a large floating structure. After falling, Easterling experienced a severe headache, vomiting, and numbness in her left arm. An ambulance was called to the scene. When paramedics arrived, they noted that Easterling was alert but was experiencing an obvious left facial droop and slurred speech. Due to concern that Easterling may have suffered a stroke, she was air lifted to St. Luke's Regional Medical Center in Boise, Idaho.

Upon arriving at St. Luke's, Easterling was examined by emergency room physician Dr. Kendall. When performing a neurological exam on Easterling, Kendall found that she exhibited a subtle left side facial asymmetry which appeared to wax and wane. The triage nurse noted that Easterling had trouble taking Tylenol and was dribbling out of the left side of her mouth. Kendall noted in his report that Easterling hit her head when she fell from the floating structure. Whether Kendall had a basis to include that finding in his report was a contested issue at trial. Kendall ordered a CT scan and basic testing of Easterling, which did not reveal any abnormalities. Kendall did not order an MRI scan or additional image testing. Believing that Easterling was suffering from a concussion, Kendall consulted the on-call neurologist, who agreed with his diagnosis. Kendall then prescribed anti-nausea medication for Easterling and discharged her from St. Luke's.

The next morning, Easterling was taken to the emergency room in Twin Falls because she was experiencing a severe headache and nausea and her father had observed her twitching in her sleep. A CT Scan and MRI were performed. After reviewing the MRI, a radiologist concluded that Easterling had a dissection of the right internal carotid artery. A carotid artery dissection is a tear in an artery wall which causes bleeding. To prevent bleeding, the dissection may clot. These blood clots then may break off and lodge in the brain, closing off blood flow and causing stroke or stroke-like symptoms. The attending physician concluded that the dissection had caused Easterling to have a stroke sometime in the previous six hours. Easterling was again air lifted to St. Luke's in Boise. Treating physicians at St. Luke's in Boise agreed that Easterling

2

had suffered a stroke due to a carotid artery dissection and Easterling was admitted for care in the pediatric intensive care unit.

Easterling remained in intensive care from September 6 to September 8, 2011. Treating physicians struggled to determine the correct course of treatment for Easterling, including whether anticoagulant treatment would be appropriate. Anticoagulants thin blood and can help prevent blood clotting that may occur due to a dissection. However, anticoagulants also carry a risk of causing hemorrhage, which could potentially be more damaging than a stroke caused by a lack of blood supply. When admitted to the intensive care unit on September 6, Easterling was started on anticoagulant treatment. However, on September 8, Easterling experienced another stroke. Easterling's treating physicians then consulted with several specialists about whether to continue Easterling on anticoagulant treatment. Little study had been performed on the impact of anticoagulant treatment in pediatric stroke patients, and the specialists consulted about Easterling's treatment disagreed about whether the potential benefits of anticoagulant treatment outweighed the risk of hemorrhage. After an initial consultation with specialists on September 8, Easterling was taken off anticoagulant treatment. However, after further consultation later that day, Easterling was put back on a low dose anticoagulant and was transferred to the University of Utah hospital. A few days after being transferred to the University of Utah, there was concern that Easterling had suffered a hemorrhagic transformation of her stroke and she was again taken off anticoagulant treatment. Easterling remained at University of Utah until she was discharged on October 1, 2011. Easterling alleges that she has suffered permanent neurological damage due to the series of strokes.

On April 3, 2013, Easterling, through her parents, brought suit against Dr. Kendall, her treating physician on September 5, 2011, for medical malpractice. Easterling alleged that Kendall was negligent in misdiagnosing her with a concussion and that such misdiagnosis resulted in her suffering further stroke and permanent neurological damage. The parties stipulated to a pretrial discovery plan, whereby Easterling's expert disclosures were due October 11, 2013, Kendall's expert disclosures were due December 10, 2013, and Easterling's rebuttal expert disclosures were due January 9, 2014.

On October 11, 2013, Easterling produced expert disclosures, disclosing Bruce Wapen, M.D., FACEP, an emergency physician, as an expert on the appropriate standard of care and on Kendall's breach thereof. That same day, Easterling also produced a disclosure of non-retained

experts which listed thirty-seven treating physicians who may be called to offer opinions consistent with the medical records. Additionally, Easterling's disclosure stated that five of Easterling's treating physicians may be called to testify that Dr. Kendall's failure to diagnose was a substantial factor in causing Easterling's injuries. Kendall filed an objection to Easterling's disclosure of non-retained experts, arguing that Easterling's disclosure of the treating physicians' causation opinions did not provide a sufficient response to an interrogatory propounded by Kendall in April 2013. Interrogatory No. 3 requested that Easterling disclose the identity of each expert expected to testify and provide a complete statement of each expert's opinions, the facts relied on in forming those opinions, and any exhibits that would be used to support those opinions.[1]

On December 5, 2013, Easterling served supplemental answers to Interrogatory No. 3. The December 5 supplementation stated that the five treating physicians identified in her disclosure of non-retained experts would offer opinions on causation consistent with opinions and facts expressed in their depositions and provided a list of quotes taken directly from each treating physician's deposition. Additionally, the December 5 supplementation stated that Wapen, Easterling's standard of care expert, would also offer opinion testimony on the issue of causation. Wapen had been deposed on November 21, 2013. During his deposition, Wapen informed Kendall's counsel that Easterling's counsel had asked him to offer opinions on causation at trial. The December 5 supplementation quoted directly from Wapen's deposition, which stated that Wapen would testify that Kendall should have diagnosed Easterling with a carotid artery dissection and started Easterling on anticoagulant treatment on September 5th and the failure to do so was a substantial factor in causing her further stroke.

In December 2013, the district court heard oral argument on Kendall's objection to Easterling's disclosure of non-retained experts and issued an order denying Kendall's motion to

---

[1] Kendall's Interrogatory No. 3 requested the following information:

INTERROGATORY NO. 3: State the name and address of each person whom the plaintiffs expect to call as an expert witness at the trial. For each such person:
  (a) State the subject matter on which the expert is expected to testify;
  (b) A complete statement of all opinions to be expressed and the basis and reasons therefore;
  (c) The facts, data or other information considered by the witness in forming the opinions;
  (d) Any exhibits to be used by the expert witness as a summary of or support for the opinions; and
  (e) Any qualifications of the witness, including a list of all publications authored by the witness within the preceding ten (10) years, the compensation to be paid for the testimony, and a list of any other cases in which the witness has testified as an expert at trial or by deposition within the four (4) preceding years.

exclude the testimony. The district court found that Easterling had failed to properly disclose any expert causation opinion held by non-retained experts in response to Interrogatory No. 3 in both Easterling's initial and supplemental disclosures. However, rather than exclude the testimony, the district court gave Easterling an opportunity to properly supplement her discovery response by January 10, 2014, and gave Kendall leave to renew the objection and seek costs if the responses were inadequate.

On January 8, 2014, Easterling supplemented her expert disclosures and responses for Interrogatory No. 3 for both retained and non-retained experts. Easterling disclosed that Wapen would testify that had Kendall not misdiagnosed her on September 5, she would have received treatment for a carotid artery dissection on that date, when the benefits of treatment would be at their maximum. Wapen's opinions were stated to be based on the depositions of treating physicians and Easterling's medical records, which were summarized in the disclosure, and 200 pages of attached scholarly articles.

Additionally, the January 8 supplementation stated that the five treating physicians would opine at trial that Kendall's misdiagnosis of Easterling caused her not to receive treatment for a carotid artery dissection on September 5 and if treatment had been timely provided, it would have more likely benefited her. The disclosures for each treating physician were essentially identical and included an identical summary of quotes from the medical record and depositions of treating physicians which allegedly formed the basis of each expert's opinion—the same summary provided to support the opinion of retained expert Wapen. On the same day, Easterling filed her rebuttal expert disclosures, disclosing both Wapen and Dr. J. Fritz Shumtz as retained experts to offer rebuttal testimony on the issue of causation.

On January 24, 2014, Kendall filed a motion to strike Wapen's causation options. Kendall argued that the district court should strike Wapen's causation opinions because Easterling had not disclosed that Wapen would testify as to causation until a month after Easterling's initial disclosures were due and the supplementations of Wapen's opinions on December 5th and January 8th were not sufficient. The same day, Kendall filed a renewed objection to Easterling's disclosure of non-retained experts, arguing that the January 8 supplementation failed to properly disclose any expert causation opinion held by the treating physicians because none of the treating physicians identified by Easterling had provided, or agreed to provide, opinion testimony on causation. The district court heard oral argument on

Kendall's motions and issued an order excluding opinion testimony on causation from Wapen and the treating physicians in Easterling's case in chief. Although the court precluded Wapen from testifying on causation in Easterling's case in chief, the court reserved ruling on whether Wapen could testify as a rebuttal causation expert.

Trial began on March 10, 2014. On March 17, 2014, Easterling filed a motion seeking to have retained experts Wapen and Shumtz offer rebuttal testimony on the issue of causation during her case in chief. Easterling argued that Kendall had opened the door to rebuttal testimony on the issue of causation by eliciting evidence regarding causation on cross examination of Dr. Wapen and treating physicians Dauplaise and Jernigan. The district court denied Easterling's motion, concluding that causation had not been raised during cross examination and, therefore, the door had not been opened to allow rebuttal testimony on that issue.

At the close of Easterling's case in chief, Kendall moved for a directed verdict. Kendall contended that Easterling failed to provide substantial evidence to prove Kendall breached the standard of care and that the breach was the proximate cause of Easterling's injuries. As relevant to this appeal, Kendall argued that Easterling failed to provide substantial evidence to prove causation because she did not provide any expert opinion testimony on that issue at trial. Easterling argued that proximate cause was reasonably inferable from the chain of circumstances presented in this case and, therefore, expert causation testimony was not necessary. The district court granted Kendall's motion for a directed verdict, holding that Easterling failed to provide substantial evidence to prove proximate cause. The district court reasoned that a jury is simply not qualified to determine whether Dr. Kendall's failure to properly diagnose and the potential delay in treatment were a substantial cause of Easterling's injuries without reliance on expert testimony or evidence. Kendall filed a memorandum for costs and attorney fees. The district court denied Kendall's request for attorney fees, but awarded Kendall $25,994.93 in costs as a matter of right and $49,463.94 in discretionary costs. Easterling timely appealed.

## II.
## ISSUES ON APPEAL

1. Whether the district court abused its discretion by excluding Dr. Wapen's opinion testimony on causation in Easterling's case in chief.

2. Whether the district court abused its discretion by excluding the treating physicians' opinion testimony on causation.

3. Whether the district court abused its discretion by denying Easterling's motion to present rebuttal causation testimony during her case in chief.

6

4. Whether the district court erred by granting Kendall's motion for directed verdict.

5. Whether the district court abused its discretion by awarding Kendall discretionary costs.

6. Whether Kendall should be awarded attorney fees on appeal.

### III.
### STANDARD OF REVIEW

This Court conducts "a review of the record to determine if the finding of the trial court that there was a discovery violation is supported by substantial and competent evidence." *State v. Stradley*, 127 Idaho 203, 207–08, 889 P.2d 416, 420–21 (1995). The Court reviews the actual sanction imposed under an abuse of discretion standard. *Id.* Likewise, the Court applies the abuse of discretion standard to review both a district court's decision whether to allow rebuttal testimony and a district court's award of discretionary costs. *Hayden Lake Fire Prot. Dist. v. Alcorn*, 141 Idaho 307, 314, 109 P.3d 161, 168 (2005); *Van Brunt v. Stoddard*, 136 Idaho 681, 686, 39 P.3d 621, 626 (2001). "To determine whether a trial court has abused its discretion, this Court considers whether the district court: (1) perceived the issue as one of discretion; (2) acted within the outer boundaries of that discretion consistent with applicable legal standards; and (3) reached its decision through the exercise of reason." *Hansen v. Roberts*, 154 Idaho 469, 472, 299 P.3d 781, 784 (2013).

"When reviewing a decision to grant or deny a motion for a directed verdict, this Court applies the same standard the trial court applied when originally ruling on the motion." *April Beguesse, Inc. v. Rammel*, 156 Idaho 500, 508–09, 328 P.3d 480, 488–89 (2014) (citation and internal quotation marks omitted). The Court determines

> whether there was sufficient evidence to justify submitting the claim to the jury, viewing as true all adverse evidence and drawing every legitimate inference in favor of the party opposing the motion for a directed verdict. This test does not require the evidence be uncontradicted, but only that it be of sufficient quantity and probative value that reasonable minds could conclude that a verdict in favor of the party against whom the motion is made is proper. Where a non-moving party produces sufficient evidence from which reasonable minds could find in its favor, a motion for directed verdict should be denied.

*Id.* at 509, 328 P.3d at 489.

### IV.
### ANALYSIS

The ultimate issue on appeal is whether the district court erred in granting Kendall's motion for a directed verdict. To determine that issue, it is necessary to first address the district

7

court's order excluding the testimony on causation that retained expert Wapen and the treating physicians would have offered and the district court's denial of Easterling's motion to present rebuttal causation testimony in her case in chief.

**1. The district court did not abuse its discretion by excluding Wapen's opinion testimony on causation.**

In "determining whether the trial court abused its discretion in imposing a sanction for a discovery violation, we must first determine whether a discovery violation occurred." *Stradley*, 127 Idaho at 208, 899 P.2d at 421. For retained experts, a party is required to disclose

> a complete statement of all opinions to be expressed and the basis and reasons therefore; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; any qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

I.R.C.P. 26(b)(4)(A)(1)(i). The timing for such disclosures shall be set in the district court's scheduling order. I.R.C.P. 16(a)(2). A district court has authority to sanction parties for non-compliance with scheduling orders, including prohibiting parties from introducing untimely disclosed evidence. I.R.C.P. 16(i); I.R.C.P. 37(b)(2)(B).

The district court ruled that Easterling failed to timely and sufficiently disclose Wapen as an expert anticipated to testify as to causation and, therefore, precluded Wapen from offering opinion testimony on causation in Easterling's case in chief. Kendall's motion to strike Wapen's causation testimony was based on Idaho Rules of Civil Procedure 16(i) and 26(e)(4). In its written order, the district court did not expressly state which authority it relied on in excluding Wapen's testimony.

The parties disagree as to whether the trial court excluded Wapen's testimony under Rule 16(i) as a sanction for violating the court's scheduling order or as a sanction for failing to seasonably and adequately supplement the expert disclosure as required by Rule 26(e). While the district court's written order does not provide the basis for excluding Wapen's causation testimony, the court's ruling at the oral hearing strongly suggests the district court's ruling was based on Rule 16(i). At the hearing, the district court expressed concern about Easterling's failure to disclose Wapen's causation testimony by the initial disclosure deadline. The court found that "[t]his isn't a change of opinion … it is as though you went out and hired a new expert …. That's not a seasonable supplementation issue. It's a new expert after the time for your expert

8

disclosure." Here, the district court found that Easterling had violated the court's scheduling order by disclosing what was in essence a new expert witness after the deadline for Easterling's initial disclosures.

The district court's scheduling order required that the parties identify each expert and provide the subject matter each witness is expected to testify to and all information required under Rule 26(b)(4). Here, Easterling timely disclosed that Wapen would offer opinion testimony as to the appropriate standard of care and Kendall's breach thereof on October 11, 2013. However, there was no indication in the initial disclosure that Wapen would testify as to causation. Kendall first learned that Wapen would offer opinion testimony on causation during Wapen's deposition on November 21, 2013, over a month after Easterling's initial disclosures were due. Two weeks later, Easterling served her December 5 supplementation, indicating that Wapen would offer opinion testimony on the issue of causation. However, this supplementation did not provide any of the information required to be disclosed for retained experts under Rule 26(b)(4). The supplementation merely stated that Wapen would testify consistent with his deposition testimony and then provided direct quotes taken from Wapen's deposition on November 21. The supplementation did not state what Wapen's opinions would be, the basis for Wapen's causation opinions, or any facts or data that Wapen relied on in developing those opinions. Easterling did not even attempt to provide such information until her January 8 supplementation and rebuttal disclosures, three months after Easterling's initial disclosures were due and one month after Kendall's initial disclosures were due.

Easterling argues that the district court's ruling is at odds with the Court's ruling in *Edmunds v. Kraner*, 142 Idaho 867, 136 P.3d 338 (2006). In *Edmunds*, the plaintiff had disclosed his standard of care expert prior to the district court's deadline, but had later filed an affidavit changing the expert's opinion on the local standard of care. *Id.* at 872, 136 P.3d at 343. The district court excluded the affidavit, finding that the affidavit was untimely under the discovery order and Rule 26(e) because it was filed more than a year after the pretrial order deadline and contained different opinions from those expressed in the first disclosure. *Id.* at 873, 136 P.3d at 344. The Court held that the district court abused its discretion because the district court's decision to exclude the affidavit was based on a pretrial order that only asked for the names—not opinions—of experts and Idaho law specifically contemplates that expert testimony can change after the initial disclosure and can be seasonally supplemented. *Id.* at 874, 136 P.3d at 345.

Easterling argues that, under *Edmunds*, she did not violate Rule 16 or 26(e) because Wapen had been disclosed as an expert by the initial disclosure deadline and the disclosure was seasonably supplemented to include causation opinions in the December 5 and January 8 supplementations.

However, this case differs from *Edmunds*. Here, the scheduling order required that Easterling provide all the information required under Rule 26(b)(4) in her initial disclosures, not just the name of each expert. Additionally, unlike *Edmunds*, no opinion expressed in Wapen's initial disclosure was modified. Rather, Easterling sought to have Wapen offer brand new opinions on an entirely different subject matter from that in her initial disclosures. This is not a case where the initial disclosures were "rejected modified, expanded upon or otherwise altered." *Id*. Easterling essentially disclosed a brand new expert and did not attempt to provide any of the information required under the scheduling order and Rule 26(b)(4) until the January 8 supplementation—three months after her initial disclosures were due. The district court's finding that Easterling violated the scheduling order by not timely or sufficiently disclosing Wapen as an expert on causation was supported by substantial and competent evidence. Rule 16(i) provides that if a party violates a court's scheduling order the court may sanction the party by excluding evidence as provided in Rule 37(b)(2)(B). I.R.C.P. 16(i). Therefore, the district court did not abuse its discretion by excluding Wapen's opinion testimony on causation.

## 2. The district court did not abuse its discretion by excluding the treating physicians' opinion testimony on causation.

At the time the district court excluded the treating physicians' opinion testimony on causation, the parties did not have an affirmative duty to disclose the opinions of non-retained experts under Idaho Rule of Civil Procedure 26(b)(4).[2] However, the Idaho Court of Appeals had held that parties do have a duty to respond to discovery requests concerning the facts and opinions to which non-retained experts will testify. *Clark v. Raty*, 137 Idaho 343, 345, 48 P.3d 672, 674 (Ct. App. 2002). "[E]xpert testimony that is not subject to the discovery limitations of Rule 26(b)(4) is not immune from discovery but, to the contrary, is subject to the full panoply of

---

[2] The district court's order was issued in February 2014. In April 2014, Rule 26(b)(4) was amended to add subsection (A)(1)(ii):

> For individuals with knowledge of relevant facts not acquired in preparation for trial and who have not been retained or specially employed to provide expert testimony in the case: a statement of the subject matter on which the witness is expected to present evidence under Idaho Rule of Evidence 702,703 or 705, and a summary of the facts and opinions to which the witness is expected to testify.

I.R.C.P. 26(b)(4)(A)(1)(ii). This amendment became effective in July 2014.

discovery that is otherwise authorized by the civil rules." *Id.* Parties have a duty to answer interrogatories asking for the facts and opinions to which their non-retained experts will testify and a duty to seasonably supplement their answers pursuant to Rule 26(e)(1)(B). *Id*. at 346, 48 P.3d at 675.

Interrogatory No. 3 requested that Easterling disclose the identity of each expert expected to testify and provide a complete statement of each expert's opinions, the facts relied on in forming those opinions, and any exhibits that would be used to support such opinions. On October 11, 2013, Easterling initially disclosed that five treating physicians may be called to testify that, to a reasonable degree of medical certainty, Dr. Kendall's failure to diagnose was a substantial factor in causing the injuries suffered by Easterling. Easterling's December 5 supplementation merely provided that the treating physicians would provide testimony consistent with their depositions and quoted excerpts directly from each physician's deposition. As found by the district court, neither of these disclosures provided the information requested in Interrogatory No. 3 because Easterling did not provide the opinions of the treating physicians or the factual basis for those opinions. Rather than exclude the causation testimony of the treating physicians at that point, the district court acted within its discretion and gave Easterling one more opportunity to supplement her response to Interrogatory No. 3.

Although the January 8 supplementation was lengthy, it nonetheless failed to provide an adequate response to Interrogatory No. 3. The disclosures for each of the five treating physicians at issue were identical. Each disclosure provided that the treating physician was expected to testify that Dr. Kendall's misdiagnosis of Easterling caused her not to receive treatment for her carotid artery dissection on September 5, 2011, and if treatment had been provided, it would have more likely than not benefitted her. Each treating physician's opinion was allegedly based on his or her treatment of Easterling and information in her medical records. Each disclosure was also accompanied by the same twenty-page summary of quotes taken from the medical records and depositions—identical to the summary that accompanied Wapen's supplemental disclosure.

At the February 28 hearing on Kendall's motion to strike, the district court was clearly disconcerted when Easterling's counsel disclosed that he had not actually consulted any of the treating physicians when drafting the January 8 supplementation because the treating physicians refused to speak with him. None of the opinions disclosed were actually provided by the treating physicians, nor had any of the treating physicians indicated that they would offer causation

11

opinions at trial. What Easterling's counsel actually provided in the January 8 supplementation was counsel's hope for what the treating physicians might say if he subpoenaed them and put them on the stand. At oral argument, the district court ruled that the treating physicians could testify about their treatment but Easterling could not attempt to elicit causation opinions. The court reasoned that the experts could not give expert opinions about causation unless Easterling had previously disclosed what their opinions would be so that Kendall could be adequately prepared for trial.

Easterling argues that she met the requirements of Rule 26 by providing opposing counsel with what Easterling's counsel *expected* the treating physicians would testify to at trial. This argument appears to be based on language in the scheduling order requiring disclosure of "the subject matter on which the [expert] witness is expected to testify." One can say what a witness' expected testimony may be without actually having spoken with the witness. However, the scheduling order requirement continues, "and information required by Rule 26(b)(4) of the Idaho Rules of Civil Procedure." Providing counsel's mere expectation as to what an expert opinion might be, without any reasonable basis to support that expectation, does not comport with Rule 26 and the policies underlying expert witness discovery. "It is fundamental that opportunity be had for full cross-examination, and this cannot be done properly in many cases without resort to pretrial discovery, particularly when expert witnesses are involved." *Clark v. Klein*, 137 Idaho 154, 158, 45 P.3d 810, 814 (2002) (citation omitted). "Before an attorney can even hope to deal on cross-examination with an unfavorable expert opinion he [or she] must have some idea of the bases of that opinion and the data relied upon." *Id*. Easterling failed to provide Kendall with accurate information as to the treating physicians' causation opinions and whether the treating physicians even held any such opinions. Here, the district court's finding that Easterling violated Rule 26(e) by not properly supplementing her responses to Interrogatory 3 was supported by substantial and competent evidence. Rule 26(e) provides that the court may exclude testimony not disclosed by a required supplementation. I.R.C.P. 26(e). Therefore, the district court did not abuse its discretion in excluding such testimony at trial.

3. **The district court did not abuse its discretion by denying Easterling's motion to include rebuttal causation testimony in her case in chief.**

Under Idaho Rule of Evidence 611, the trial court shall

exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation

effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

I.R.E. 611(a). "Exercise of this control is a question of the trial court's discretion." *State v. Koch*, 157 Idaho 89, 101, 334 P.3d 280, 292 (2014). The issue in this case deals with rebuttal evidence. "Rebuttal evidence is evidence that explains, repels, counteracts, or disproves evidence which has been introduced by or on behalf of the adverse party." *Van Brunt v. Stoddard*, 136 Idaho 681, 685–86, 39 P.3d 621, 625–26 (2001).

Easterling moved the district court to allow her to present causation testimony from her rebuttal experts in her case in chief, contending that, during cross-examination of retained expert Wapen and treating physicians Dauplaise and Jernigan, Kendall opened the door to causation testimony. The district court denied the motion, reasoning that Kendall had not questioned any of the experts on causation issues and, therefore, rebuttal causation testimony would be inappropriate. The court recognized that the matter was one of discretion. Additionally, the court acted within the bounds of its discretion and reached its ruling through reason.

Wapen testified during trial that, in his opinion, Kendall failed to accurately record Easterling's medical history and failed to perform additional imaging studies. Wapen then opined that it was below the standard of care to fail to conduct those studies which would have led to the proper diagnosis—a carotid artery dissection. On cross examination, Kendall's counsel questioned Wapen about whether the symptoms presented by Easterling on September 5, 2011, could be indicative of other ailments besides a carotid artery dissection, about other conditions that may cause stroke-like symptoms, and about tests that may be used in diagnosing a person presenting stroke symptoms. Additionally, Kendall's counsel asked Wapen if he had reviewed records in which providers questioned whether a carotid artery dissection was the correct diagnosis.

Dr. Dauplaise testified on direct examination that he treated Easterling from September 6 to September 8, 2011, and, during the course of his treatment, he diagnosed Easterling with a carotid artery dissection and started Easterling on anticoagulation therapy. Similarly, Dr. Jernigan testified on direct examination that he was consulted by Dauplaise as to Easterling's diagnosis and the appropriate course of treatment. On cross examination, Kendall's counsel asked both treating physicians whether they had any doubt as to Easterling's diagnosis and/or the appropriate course of treatment.

13

In ruling on Easterling's motion, the district court found that Easterling had not shown that the above questioning had opened the door to causation. The court found that the cross examination of Wapen was generally limited to determining what Wapen had considered in determining that the proper diagnosis was a carotid artery dissection and that Kendall's counsel had been very careful to avoid causation issues. The court then found that the cross examination of the treating physicians did not open up the door to causation testimony.

Easterling argues that the district court abused its discretion by not considering the prejudice to Easterling in not allowing the rebuttal causation testimony in her case in chief. Easterling relies on *State v. Colon*, a case from the Connecticut Supreme Court, which discussed the exclusion of rebuttal testimony in a murder case where the defendant was sentenced to death. 272 Conn. 106, 186–87, 864 A.2d 666, 722 (2004). There, the Connecticut Supreme Court found that a court, in its discretion, may allow rebuttal testimony that would ordinarily be inadmissible, where the other party opened the door to rebuttal and not allowing such rebuttal would result in prejudice. *Id.* However, the holding in *Colon* is largely irrelevant in this case, as the district court specifically found that the door to rebuttal causation testimony had not been opened through cross-examination.

The district court's determination that Kendall had not opened the door for rebuttal causation testimony was reached through an exercise of reason and the district court acted within its discretion in concluding that rebuttal testimony on that issue would, therefore, be inappropriate.

### 4. The district court did not err in granting Kendall's motion for directed verdict.

In a medical malpractice case, a "plaintiff has the burden of proving not only that a defendant failed to use ordinary care, but also that the defendant's failure to use ordinary care was the proximate cause of damage to the plaintiff." *Pearson v. Parsons*, 114 Idaho 334, 339, 757 P.2d 197, 202 (1988) (citation and internal quotation marks omitted). "To establish proximate cause, a plaintiff must demonstrate that the provider's negligence was both the actual and legal (proximate) cause of his or her injury." *Coombs v. Curnow*, 148 Idaho 129, 139, 219 P.3d 453, 463 (2009). Actual cause "is a factual question focusing on the antecedent factors producing a particular consequence." *Id.* at 139–40, 219 P.3d at 463–64. Legal cause exists when "it is reasonably foreseeable that such harm would flow from the negligent conduct." *Id.* at 140, 219 P.3d at 464 (citation and internal quotation marks omitted).

14

"Proximate cause in medical malpractice cases involving more than one possible cause of injury will be established if it is shown that the defendant's conduct was a substantial factor in bringing about the injury suffered by the plaintiff." *Id.* (citation and internal quotation marks omitted). Whether negligent conduct was a substantial factor in bringing about the plaintiff's injuries "may be proven by direct evidence or by showing a 'chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable.'" *Id.* (quoting *Weeks v. E. Idaho Health Serv.*, 143 Idaho 834, 839, 153 P.3d 1180, 1185 (2007)). "The question of proximate cause is one of fact and almost always for the jury." *Id.* (internal quotation marks omitted).

Idaho Code sections 6-1012 and 6-1013 require that, in medical malpractice cases, the applicable standard of care and breach of that standard be proved by expert testimony. *Id*. There is no such provision requiring expert testimony to prove proximate cause. Rather, the admission of testimony to prove proximate cause in medical malpractice cases is governed solely by the Idaho Rules of Evidence. *Sheridan v. St. Luke's Reg'l Med. Ctr.*, 135 Idaho 775, 785, 25 P.3d 88, 98 (2001). Although expert testimony is not expressly required to establish causation in medical malpractice cases, "such testimony is often necessary given the nature of the cases." *Coombs*, 148 Idaho at 140, 219 P.3d at 464. "Expert testimony is generally required because 'the causative factors are not ordinarily within the knowledge or experience of laymen composing the jury.'" *Id*. (quoting *Flowerdew v. Warner*, 90 Idaho 164, 170, 409 P.2d 110, 113 (1965)).

At trial, Easterling presented evidence that on September 5, 2011, she exhibited signs of stroke including left side paralysis, facial drooping, and slurred speech. Kendall testified that when performing a neurological exam on Easterling he found that she exhibited a subtle left side facial asymmetry which appeared to wax and wane. Kendall also testified that he had been informed by the triage nurse that Easterling had trouble taking Tylenol and was dribbling out of the left side of her mouth. These symptoms were noted in Kendall's medical report. Kendall ordered a CT scan and basic testing which did not reveal any abnormalities, but he did not order an MRI or additional image testing.

Wapen testified that a very common presentation for a dissection includes a headache on the same side as the dissection, weakness or paralysis on the opposite side, and waxing and waning facial asymmetry. Wapen opined that Kendall breached the local standard of care by recording that Easterling hit her head when Kendall's evaluation had not revealed any head

15

injury and no other medical personnel that day had reported a head injury. Additionally, Wapen testified that Kendall breached the standard of care by concluding that Easterling had no neurological abnormalities after documenting signs of neurological abnormalities and by not conducting additional imaging studies and an MRI which would have led Kendall to the proper diagnosis—a carotid artery dissection.

Evidence was presented showing that Easterling experienced a stroke within twenty-four hours of being discharged by Kendall. Dr. Duplaise, one of Easterling's treating physicians, testified that he diagnosed Easterling on September 6, 2011, with a carotid artery dissection and that he started Easterling on anticoagulant treatment. Testimony at trial showed that a carotid artery dissection is a tear in an artery wall that can create a risk of blood clots forming and the clots then may cut off blood flow to part of the brain and cause stroke or stroke-like symptoms. Dr. Jernigan, another one of Easterling's treating physicians, testified that on September 6 he concluded that anticoagulant treatment would be appropriate in order to prevent a new blood clot from forming or an existing clot from extending and causing further injury. It is undisputed in the record that anticoagulant treatment does carry a risk of hemorrhage and Easterling experienced further strokes after starting anticoagulant treatment.

Easterling contends that the above evidence established a chain of circumstances from which a reasonable person could conclude that Easterling's injury was a natural consequence of Kendall's misdiagnosis and that his failure to diagnose the dissection was a proximate cause of her injuries. Here, Easterling's medical malpractice claim alleges that Kendall's failure to diagnose Easterling with a carotid artery dissection on September 5, 2011, delayed Easterling's treatment for the dissection until September 6, 2011. To avoid a directed verdict, Easterling needed to present sufficient evidence that a reasonable jury could find that the one-day delay in treatment resulting from Kendall's misdiagnosis was a substantial factor in causing Easterling's injuries. The specific issue here is whether Easterling needed to present expert testimony to support such a finding or whether the evidence on the record presented a chain of circumstances from which proximate cause could be reasonably and naturally inferred by a jury.

The district court found that expert testimony was necessary to prove proximate cause because the proper treatment for a carotid artery dissection and the effect of delaying such treatment are not within the ordinary experience of the average person. Easterling argues that the district court improperly weighed conflicting evidence of whether anticoagulant treatment was

16

appropriate in ruling on Kendall's motion for a directed verdict. In ruling on Kendall's motion, the district court discussed the uncertainty among treating physicians and consulting experts on whether anticoagulant treatment would be appropriate in Easterling's case. After Easterling experienced a stroke on September 8, while on anticoagulant treatment, treating physicians consulted with several pediatric neurologists and radiologists, and there was no clear answer as to whether anticoagulant treatment should be continued. For example, one radiologist opined that the risk of bleeding associated with anticoagulant treatment may outweigh the benefits. A pediatric neurologist stated that anticoagulant treatment would be appropriate because it is less likely to cause bleeding in children, but acknowledged that not treating with anticoagulants may also be appropriate.

The district court reasoned that "where the treating physicians, all highly-trained medical specialists like pediatric neurologists, testify that they were unsure of what treatment was appropriate … the treatment and the effects of that treatment or the delay in that treatment simply cannot be within the knowledge or experience of laymen." The court then went through the testimony of the treating physicians emphasizing how difficult Easterling's diagnosis and treatment had been and concluded that asking the jury to determine a disease mechanism, the proper treatment and how a delay affected Easterling's injuries, as well as the outcome of proper treatment, is asking the jury to do nothing more than speculate. While the district court did consider the uncertainty of treating physicians in ruling on Kendall's motion, the court specifically stated that it was considered for the sole purpose of demonstrating the complex nature of the evidence and why a lay person cannot arrive at a decision as to causation without the benefit of an expert. The district court did not improperly weigh conflicting evidence as to whether anticoagulant treatment was the appropriate treatment for a dissection. Rather, the court used the treating physicians' uncertainty as an example of why lay persons would not be able to determine what treatment would have been appropriate on September 5 or whether the delay in treatment had an impact on Easterling's injuries without the aid of expert testimony.

Easterling relies on *Sheridan*, where this Court held that a district court did not err in denying a defendant's motion for a directed verdict even though the plaintiffs had not offered expert testimony to prove proximate cause. 135 Idaho at 786, 25 P.3d at 99. In that case, the plaintiffs had brought a claim against St. Luke's and their physician for negligently treating their son's jaundice leading to permanent and irreparable brain damage. *Id.* at 778, 25 P.3d at 91. At

trial, it was undisputed that the plaintiffs' son had jaundice within 24 hours of his birth and testimony established that the presence of jaundice within the first twenty-four hours of birth requires further evaluation such as serum bilirubin measurement. *Id.* at 786, 25 P.3d at 99. Evidence was also presented that "high bilirubin levels can be successfully treated by the use of bili lights and blood exchange transfusions." *Id.* The plaintiffs presented testimony that the treating nurses at St. Luke's had breached the standard of care by not charting the progression of jaundice, not noting possible blood incompatibility problems between the mother and child, and by sending the plaintiffs home without warning them that the newborn's jaundice was abnormal. *Id.* Three days later, the newborn was re-hospitalized and diagnosed with kernicterus, "a form of cerebral palsy associated with neonatal history of elevated bilirubin, a symptom of which is jaundice." *Id*. This Court found that, although "it was days later before the high bilirubin levels were measured, a jury could reasonably and naturally infer from the chain of circumstances that a breach of the standard of care in the first hospital stay proximately caused [the child's] injuries." *Id*.

However, in *Swallow v. Emergency Med. of Idaho, P.A.*, we addressed our holding in *Sheridan*, stating that, "we did not hold that expert testimony is never necessary in order to prove causation in a medical malpractice case. We simply held that expert testimony that the nurses' negligence was a proximate cause of the child's injuries was not required under the facts of that particular case." 138 Idaho 589, 596, 67 P.3d 68, 75 (2003). In *Swallow*, this Court held that expert testimony was necessary to prove whether an excessive dose of Cipro given to the plaintiff was a cause of his heart attack because "it is a matter of science that is far removed from the usual and ordinary experience of the average person. A jury, comprised of lay people, is simply not qualified to determine that issue without the assistance of expert testimony that Cipro can cause a myocardial infarction." *Id.* at 598, 67 P.3d at 77.

Easterling argues that the present case is like *Sheridan*, in that her claim is based on whether the failure to treat her caused a particular injury. Easterling contends that evidence was presented showing that a natural consequence of a carotid artery dissection is a stroke and Easterling, in fact, suffered a stroke after being discharged and prior to being properly diagnosed and treated on September 6. Easterling also contends that the fact that she was treated with anticoagulants on September 6 is sufficient to show that anticoagulant treatment would have been appropriate on September 5.

There is no bright-line rule to determine whether expert testimony is required to prove proximate cause. The inquiry is highly dependent on the specific circumstances of each case. *See id.* at 596, 67 P.3d at 75. Here, the evidence presented at trial does not provide a chain of circumstances upon which a lay person could infer that Kendall's misdiagnosis was a substantial factor in causing Easterling's injuries. Although Easterling presented evidence that anticoagulant treatment was used on September 6, that fact has little bearing on whether anticoagulant treatment would have been appropriate on the September 5 or whether the delay in starting such treatment had any impact on Easterling's injuries. This is especially true where it is undisputed that Easterling continued to suffer strokes while on anticoagulant treatment. Easterling did suffer a stroke after being discharged on September 5 and before beginning treatment on the 6th. However, there is no evidence on the record as to what impact beginning treatment on September 5 may have had. Whether anticoagulant treatment would have been more effective if started before Easterling experienced a stroke on September 6 is a highly-technical medical question which requires the testimony of medical experts in order for a reasonable jury to find proximate cause. Easterling presented no evidence from which a lay person could infer that the course of Easterling's treatment and her ultimate injuries would have been any different had Kendall diagnosed her with a carotid artery dissection and started treatment on September 5. In this case, a jury comprised of lay people is not qualified to determine whether Kendall's misdiagnosis and the resulting delay in Easterling's treatment was a substantial factor in causing her injuries. The district court, therefore, did not err in granting Kendall's motion for a directed verdict.

**5. The district court abused its discretion in awarding Kendall discretionary costs.**

Under Idaho Rule of Civil Procedure 54(d)(1)(D), "[a] trial court may, in its discretion, award a prevailing party certain costs where there has been a showing that the costs are necessary and exceptional, reasonably incurred, and should in the interests of justice be assessed against the adverse party." *Hayden Lake Fire Prot. Dist. v. Alcorn*, 141 Idaho 307, 314, 109 P.3d 161, 168 (2005) (internal quotation marks omitted). The party opposing an award of discretionary costs bears the burden of demonstrating that the district court abused its discretion. *Id.* To survive appeal, an award of discretionary costs must include "[e]xpress findings as to the general character of requested costs and whether such costs are necessary, reasonable, exceptional, and in the interests of justice." *Id.*

19

Whether discretionary costs, including expert witness fees, are "exceptional" depends on whether "the nature of the case was itself exceptional." *Id.* Because expert testimony is required in every medical malpractice case, expert witness fees in these cases are generally considered ordinary—not exceptional. *Nightengale v. Timmel*, 151 Idaho 347, 355, 256 P.3d 755, 763 (2011). "Absent other findings, there is no basis for every expert witness' testimony to be considered 'exceptional' simply because it requires specialized knowledge." *Id.* "The mere fact numerous experts were retained or numerous amendments were filed does not standing alone render a case exceptional." *Hoagland v. Ada Cnty.*, 154 Idaho 900, 914, 303 P.3d 587, 601 (2013). In *Hoagland*, this Court set forth factors a district court should consider when determining whether costs are exceptional: "whether there was unnecessary duplication of work, whether there was an unnecessary waste of time, the frivolity of issues presented, and creation of unnecessary cost that could have been easily avoided. Most importantly, however, a court should explain *why* the circumstances of a case render it exceptional." *Id.* (emphasis in original).

Here, the district court recognized that this issue was one of discretion. However, the district court did not reach its determination that the costs awarded were exceptional through an exercise of reason and its award of costs was outside the bounds of its discretion. The district court granted Kendall $49,463.94 in discretionary costs based on the expenses Kendall incurred in retaining his causation experts beginning in December 2013. The district court relied on *Lakeland True Value Hardware, LLC v. Hartford Fire Ins. Co.*, where this Court held that a party's conduct may support an award of discretionary costs. 153 Idaho 716, 730, 291 P.3d 399, 413 (2012). The district court found that Easterling failed to timely identify a retained causation expert and provided misleading information about the treating physicians' opinions on causation, and those decisions exacerbated costs incurred by Kendall. Additionally, the district court found that because the nature of Easterling's injury and treatment were complex, expert testimony on causation was necessary for her to prove causation and her decision not to retain a causation expert impacted the costs to Kendall.

Easterling contends that Kendall's expert fees were not "exceptional" because they were not incurred because of Easterling's failure to provide expert causation testimony or Easterling's discovery violations. Easterling contends that Kendall would have had to hire these experts even if Easterling had properly retained and disclosed a causation expert and that the district court did not explain how the alleged discovery violations increased the costs of retaining such experts.

20

The district court failed to provide an explanation for how Easterling's discovery decisions made Kendall's expert witness fees exceptional. In medical malpractice cases it is necessary for the parties to provide expert testimony. As argued by Easterling, Kendall would have had to hire causation experts even if Easterling had properly retained her own causation expert. The district court did not provide an explanation for how Easterling's discovery decisions transformed normal costs of malpractice defense—expert witness fees and expenses—into exceptional ones.

The district court also found that Idaho Rule of Civil Procedure 11(a)(1) was an alternative basis for awarding discretionary costs to Kendall. Rule 11(a)(1) provides that:

> The signature of an attorney or party constitutes a certificate that the attorney or party has read the pleading motion or other paper; that to the best of the signor's knowledge, information, and belief after reasonable inquiry it is well grounded in fact and is warranted by existing law … and that is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

I.R.C.P. 11(a)(1). The district court found that Easterling's counsel violated Rule 11(a)(1) by filing discovery responses purporting to include the treating physicians' opinions on causation when Easterling's counsel had not even spoken to the treating physicians on this issue. Easterling argues that there was no Rule 11(a)(1) violation because Interrogatory No. 3 only asked for what counsel *expected* the treating physicians opinions to be and, therefore, her response comports with Rule 26.

Regardless of whether Easterling's counsel violated Rule 11(a)(1), the district court abused its discretion in awarding Kendall his expert witness fees and costs as the sanction for this perceived violation. Idaho Rule of Civil Procedure 11(a)(1) "is a court-management tool, meant to focus on discrete pleading abuses or other types of litigation misconduct." *State v. Keithly*, 155 Idaho 464, 468, 314 P.3d 146, 150 (2013). The district court has the authority to impose an "appropriate sanction" against an attorney or represented party for violating Rule 11, including the costs or expenses incurred by the other party because of the filing. I.R.C.P. 11(a)(1). Rule 11 does not provide a basis to award costs against a party that are completely unrelated to the alleged violation. Kendall's costs for retaining expert witnesses did not arise from the misrepresentation, and are not an appropriate sanction under Rule 11(a). The district court abused its discretion in awarding Kendall his causation expert fees and expenses as discretionary costs. We therefore vacate the award of discretionary costs.

21

**6. Kendall is not entitled to attorney fees on appeal.**

The Court will award fees to a prevailing party under Idaho Code section 12-121 when the Court believes "that the action was pursued, defended, or brought frivolously, unreasonably, or without foundation." *Idaho Military Historical Soc'y, Inc. v. Maslen*, 156 Idaho 624, 633, 329 P.3d 1072, 1081 (2014) (citation and internal quotation marks omitted). Fees will generally not be awarded for arguments that are based on a good faith legal argument. *Id*. Here, Easterling raised good faith legal arguments as to the district court's award of discretionary costs and the district court's grant of directed verdict. This appeal was not frivolous, unreasonable, or without foundation. Therefore, we decline to award Kendall attorney fees on appeal.

## IV.
## CONCLUSION

We affirm the district court's decisions to grant a directed verdict to Kendall, to exclude Easterling's expert opinion testimony on causation, and to deny Easterling's motion to present rebuttal evidence in her case in chief. We vacate the district court's award of discretionary costs to Kendall. No costs or attorney fees to either party on appeal.

Justices EISMANN, BURDICK, W. JONES and HORTON CONCUR.